**BETHLEHEM STEEL CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 84–714.**

United States Court of Appeals, Federal Circuit.

Aug. 27, 1984.

Terence P. Stewart, Washington, D.C., argued for appellant. With him on the brief were Eugene L. Stewart, Paul W. Jameson, and Mary Elizabeth Tuck, Washington, D.C.

Curtis H. Barnette, Gen. Counsel, Meredith Hemphill, Jr., Asst. Gen. Counsel, Bethlehem, Pa., Laird D. Patterson, Gen. Atty., Washington, D.C. and Roger W. Robinson, Gen. Atty., Bethlehem, Pa., of counsel.

Francis J. Sailer, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C., and Velta A. Melnbrencis, Asst. Director, New York City.

Before DAVIS, Circuit Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.

DAVIS, Circuit Judge.

Bethlehem Steel Corporation (Bethlehem) appeals from a decision of the Court of International Trade (CIT), dismissing appellant's complaint against appellee United States (the Government) for lack of jurisdiction on the ground that the former's summons was not timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(ii). *Bethlehem Steel Corp. v. United States*, 571 F.Supp. 1265 (CIT 1983). We reverse, holding that Bethlehem's summons was timely filed, and remand the case to the CIT for consideration on the merits.

I

In January 1982, five other American steel companies filed countervailing duty petitions with the Commerce Department's International Trade Administration (ITA).

The petitions alleged, *inter alia*, that the manufacturers, producers, or exporters of certain Spanish steel products were receiving benefits from the Spanish government which constituted subsidies.[1] Several days later, Bethlehem requested that the ITA include Bethlehem as a party to the investigative proceedings, pursuant to 19 C.F.R. § 355.7(i)(4). In February 1982, the ITA issued a notice of its determination to initiate countervailing duty investigations of nine carbon steel products from Spain. 47 Fed.Reg. 5753. In June 1982, the International Trade Commission (ITC) made a preliminary determination that there was a "reasonable indication" that six types of Spanish steel imports (of the nine types which were under investigation) were "materially injur[ing] or threaten[ing] ... [to] material[ly] injur[e]" an American industry. 47 Fed.Reg. 26038.[2] In August 1982, the ITA published a notice of its "Preliminary Affirmative Countervailing Duty Determinations; Certain Steel Products from Spain". 47 Fed.Reg. 38161. That notice announced the ITA's preliminary determination that "there is reason to believe or suspect that certain benefits which constitute subsidies ... are being provided to manufacturers, producers, or exporters in Spain of certain steel products ...." The notice went on to identify three programs which the ITA had preliminarily found to confer benefits constituting subsidies on the six products still under investigation.

It also reported the ITA's preliminary finding that the Desgravacion Fiscal a la Exportacion (DFE) program was not a subsidy because the amount of money it rebated to exporters was not excessive.[3]

Pursuant to 19 U.S.C. § 1671b(b), the ITA estimated the net amount of the subsidy it believed that manufacturers, producers and exporters of the six products were receiving. It then directed the U.S. Customs Service to suspend liquidation of all entries from Spain of the six steel products under investigation and to require a cash deposit or the posting of a bond or security for each entry after the date of the notice of the preliminary affirmative determination. *See* 19 U.S.C. § 1671b(d).[4]

The ITA published its "Final Affirmative Countervailing Duty Determinations" on November 15, 1982. 47 Fed.Reg. 51438. In that notice, the ITA determined that the three programs which it had preliminarily labeled as subsidies did, in fact, constitute subsidies. In addition, it found that two of the Spanish manufacturers, producers, and importers subject to the investigation were receiving countervailable cash grants. The notice also said that the ITA had determined that the DFE program (as well as other programs) did not constitute a subsidy.

As a result of that notice, the suspension of liquidation as to all six products from Spain was continued, cash deposits or bonds in specified amounts were required,

---

1. The alleged benefits included the excessive remission of indirect taxes (the "DFE"), export credit insurance and premium rates, preferential loans, preferential loan guarantees, preferential export financing programs, capital grants, refinancing of existing debt, amendment of annual financial investment plans, exceptional credit for new investments, deferral of tax and social security benefits, and research and development funding.

   The Department of Commerce and the International Trade Commission (ITC) share the responsibilities for a countervailing duty investigation. The ITA (as Commerce's delegatee) determines whether the manufacturers, producers, or exporters of the imported merchandise receive subsidies from their governments, and the ITC decides whether the subsidized imports are injuring or threatening to injure a domestic industry. (In certain circumstances, not appli-

cable here, no injury determination is required.) *See* 19 U.S.C. § 1671, *et seq.*

2. The ITC's determination ended the investigation as to the three types of steel imports as to which injury was *not* found. 19 U.S.C. § 1671b(a).

3. Under the DFE, an exporter is given a sum of money at the time its merchandise is exported.

4. With respect to two of the six products, the ITA determined that "critical circumstances" were present and ordered that liquidation of all as-yet unliquidated entries of those two products should be suspended if they "entered, or [were] withdrawn from warehouse, for consumption" in the ninety-day period before the ITA's preliminary determination was published. *See* 19 U.S.C. § 1671b(e).

the ITC was notified of the determinations, and the ITC's 45-day maximum time period for its final injury investigations began. The ITC notified the ITA of its final affirmative injury determination on December 21, 1982. 48 Fed.Reg. 51 (January 3, 1983). It found that an American industry was "materially injured" as a result of imports of the six Spanish steel products. On January 3, 1983, the ITA issued countervailing duty orders covering all entries of the six products. 48 Fed.Reg. 51.

On January 7, 1983, Bethlehem filed a summons and complaint with the Court of International Trade challenging one aspect of the ITA's final determination on Spanish steel products—the finding that the DFE was not a subsidy. In September 1983, the CIT dismissed the action for lack of subject matter jurisdiction because the summons had not been, in the court's view, filed within the time limits specified by 19 U.S.C. § 1515a(a)(2)(A) and (B). Those subsections provide, in pertinent part:

(2) Review of determinations on record

(A) In general.—Within thirty days after the date of publication in the Federal Register of—

(i) notice of any determination described in clause (ii), (iii), (iv), or (v) of subparagraph (B), or

(ii) an antidumping or countervailing duty order based upon any determination described in clause (i) of subparagraph (B), an interested party who is a party to the proceeding in connection with which the matter arises may commence an action in the United States Court of International Trade by filing a summons, and within thirty days thereafter a complaint, each with the content and in the form, manner, and style prescribed by the rules of that court, contesting any factual findings or legal conclusions upon which the determination is based.

(B) Reviewable determinations.—The determinations which may be contested under subparagraph (A) are as follows:

(i) Final affirmative determinations by the Secretary and by the Commission under section 1303 of this title, or by the administering authority [the Commerce Department] and by the Commission under section 1671d or 1673d of this title.

(ii) A final negative determination by the Secretary, the administering authority, or the Commission under section 1303, 1671d, or 1673d of this title.[5]

In the CIT's eyes, the ITA's finding regarding the DFE was a "final negative determination" within the meaning of 19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(ii), *supra,* and could be reviewed by the CIT only if a summons were filed within thirty days of publication (November 15, 1982) of the ITA's final determination in the Federal Register. Bethlehem's summons, accordingly, was deemed untimely because it was filed beyond that thirty-day limit. The court rejected Bethlehem's contention that the DFE finding was merely a negative aspect of a "final affirmative determination" which should be appealed at a later time, after the countervailing duty order had been issued. *See* 19 U.S.C. § 1516a(a)(2)(A)(ii) and (B)(i). The court relied, instead, on the CIT opinion in *Republic Steel Corp. v. United States,* 4 CIT 17 (1982), which had held that the preliminary findings by the ITA that certain programs did not constitute subsidies were "negative determinations" and could be appealed immediately after their publication.

## II

The statute distinguishes between a "final affirmative determination" and a "final negative determination" in countervailing duty matters, both in the procedural provisions for the administrative proceedings (19 U.S.C. § 1671d) and in the appeal provision just quoted (19 U.S.C. § 1516a(a)(2)(B)). Under that scheme, the question is whether the ITA's holding that the DFE was not a subsidy with respect to the products at issue was a "negative de-

---

**5.** 19 U.S.C. §§ 1303 and 1671d deal with countervailing duty proceedings such as those involved here.

termination" in itself, or was merely one part or aspect of an overall "affirmative determination" that as a whole the affected products had been aided by subsidies. We agree with the latter position and also hold that Congress authorized (in 19 U.S.C. § 1516a(a)(2)(A)(ii) and § 1516a(a)(2)(B)(i), *supra*) domestic interests like Bethlehem to appeal, after publication of a countervailing duty order, from any adverse conclusion in such an overall "affirmative determination" lessening the amount of countervailing duties. Accordingly, Bethlehem's appeal here was timely.[6]

The very form of the ITA's finding that the DFE program did not constitute a subsidy strongly tends to demonstrate that it was not an appealable "negative determination" in itself.[7] That particular finding was included towards the end of a long public notice entitled, "Final *Affirmative* Countervailing Duty Determinations; Certain Steel Products from Spain". 47 Fed. Reg. 51438 (November 15, 1982) (emphasis added). The notice began with a summary that reported only that the ITA had "determined that certain benefits which constitute subsidies are being provided to manufacturers, producers, or exporters in Spain of certain steel products ...." The notice listed the four programs which the ITA had found to confer subsidies on the six products under investigation. The ITA found that all of the six products received some subsidy; it did not determine that any of the products received no subsidy at all. Consequently, liquidation of entries of all six imported products remained suspended and subject to the requirement of the posting of a cash deposit, bond, or security.[8]

The adverse impact on Bethlehem of the ITA's negative finding regarding DFE, included in the overall affirmative determination, was that the cash deposit, bond, or security which the importers were required to post—and the duties later assessed— would be smaller than if the ITA had found that the DFE was a subsidy and had included it in its conclusion as to the net subsidy received by each manufacturer, producer, or exporter of the six steel products. Thus, the amount of the proper countervailing duty was directly involved.

In this connection it is significant, in evaluating Bethlehem's right to question this "negative" conclusion on an appeal from the countervailing duty order, that the company would undoubtedly have such a right of appeal if the ITA had made the affirmative finding that the DFE was a subsidy but then underestimated its magnitude. In that comparable situation Bethlehem would be subject to exactly the same type of injury—lower deposit or security requirements and lower duties imposed on importers—and would likewise be complaining that the ITA had underestimated the duties owed.[9] In that instance, under the statute, an appeal would indisputably be from an affirmative determination and the time for appeal would indisputably be within 30 days after publication of the countervailing duty *order*, not the ITA's final administrative determination. In the light of the very close connection between Bethlehem's present case and this hypothetical one, it is difficult to believe that Congress provided that Bethlehem cannot wait until the countervailing duty order before challenging the amount of the duty

---

**6.** On this appeal, both Bethlehem and the United States support this position.

**7.** There is no indication that the form of this "Final Affirmative Countervailing Duty Determinations" was at all unusual.

**8.** The suspension of liquidation and the requirement that bond be posted began after the ITA's preliminary affirmative determination. *See* Part I, *supra.*

**9.** At least since enactment of the Trade Agreements Act of 1979, it has been clear that challenges to the amount of duty assessed are entitled to judicial review. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 180–181 (1979). ("[U]nder present ... [law] it is not clear whether a domestic manufacturer can challenge the *amount* of a dumping or countervailing duty assessment or only the total failure to assess such a duty. The ... [new law] ... would leave no doubt that judicial review may be sought on either basis".) (Emphasis in original.)

rates (and the underlying negative finding on the DFE).

We are, of course, aware that the CIT has drawn a distinction between a challenge to a finding that a program does not constitute a subsidy and a challenge to the alleged undervaluing of an acknowledged subsidy. *See Allegheny Ludlum Steel Corp. v. United States*, slip op. 84–16 (CIT March 7, 1984); *United States Steel Corp. v. United States*, slip op. 83–65 (CIT June 28, 1983), *vacated*, slip op. 84–12 (CIT Feb. 24, 1984); *United States Steel Corp. v. United States*, slip op. 83–59 (CIT June 17, 1983), *vacated*, slip op. 84–12 (CIT Feb. 24, 1984). We need not now decide the propriety of making such a distinction *before* a countervailing duty order is published, so as, perhaps, to bar early complaints of undervaluing as premature. This distinction is, however, wholly artificial after the issuance, as here, of a countervailing duty order. At that point, whether the complaint is that the ITA has erroneously decided that one program is not a subsidy or whether it is that a subsidy has been undervalued, the essence of the attack is still the same—it is directed towards the *amount* of duties to be assessed. At least then, there is no reason to prohibit Bethlehem from challenging a countervailing duty order on the ground that the projected duty assessments do not take a particular subsidy into account,[10] when a challenge to projected duty assessments on the ground of inaccurate computation would clearly be permissible.

Moreover, to demand an earlier challenge by Bethlehem to the ITA's finding that the DFE was not a subsidy might well have called for a needless appeal before the countervailing duty order was published. At the time the ITA made its final determination, the ITC had not yet made final affirmative injury determinations for the products Bethlehem alleged were being subsidized by the DFE, and there was no legal requirement that an ITC determination be made within 30 days. *See* Part I, *supra.*

Although the ITA's notice was entitled *"Final* Affirmative Countervailing Duty Determinations ..."* (emphasis added), the determinations were final only in the sense that they reflected the *ITA's* final investigative findings on the question of subsidies. But in the context of the countervailing duty investigation as a whole, they were, as the Government has argued, only "interlocutory" in nature and effect. After the notice's issuance, there still remained one last requirement before a countervailing duty order could issue—the ITC's final injury determination. If the ITC had found no injury, the investigation would have been terminated, and no countervailing duty order would have been promulgated. The decision below requires, however, an interested domestic party to appeal from the ITA determination even though shortly thereafter the whole question of duty assessment could become moot because the ITC found no domestic injury whatever. It is highly unlikely that Congress would call for such a potentially useless appeal. It is much more likely that Congress anticipated that the domestic interest could and would wait until after the countervailing duty order issued.

The upshot of these considerations (textual, structural, and practical) is that the preferred interpretation of the provisions of 19 U.S.C. § 1516a(a)(2)(A) and (B), *supra*, is that (a) the ITA's conclusion as to the DFE was but one aspect of the overall affirmative determination and (b) Bethlehem could properly appeal, as it did, with

---

**10.** We disagree with the CIT's comments, in the opinion below, that Bethlehem was not "really" challenging the countervailing duty order because its complaint only disputed the ITA's finding on DFE, and that finding was not even mentioned in the countervailing duty order. It is true that Bethlehem's complaint was not that a countervailing duty order had been published; it was, however contesting the rates of duties listed in that countervailing duty order, on the ground that they did not take into account the alleged DFE subsidy. The fact that the countervailing duty order did not explicitly mention the ITA's finding regarding the DFE program is of no significance. The order was squarely, though implicitly, based on that finding; without it, the duty rates assigned would have been greater.

respect to that DFE conclusion within 30 days after the countervailing duty order. In these circumstances that order triggered the appeal time. Only then did it become clear and definite that Bethlehem had a real complaint as to the ITA's DFE conclusion.[11]

### III

Bethlehem has alternatively raised before us the possibility of harmonizing its position with earlier CIT cases upholding earlier appeals in comparable circumstances [12] on the basis that interested parties in Bethlehem's position have a statutory option as to the time to seek judicial review of negative aspects of a determination—after the determination, or after the countervailing duty order, or perhaps at both times. The Government, which, as we have pointed out (n. 6, *supra*), supports Bethlehem's stance that its appeal here was timely, strongly denies such an option. We do not accept Bethlehem's alternative position that an option always exists in cases of this type; under our reading of the statute Congress did not normally contemplate such a proliferation (and perhaps duplication) of appeals. But in rejecting the position that such an option always exists, we leave open the question whether there may possibly be occasions on which a negative subsidy finding can be severed from affirmative subsidy findings respecting the same product, and then judicially challenged on a separate, "interlocutory" basis. We do decide, however, that if such an earlier appeal is ever permissible, it could be taken only on the ground that Congress gave for specifically providing interlocutory appeals in the Trade Agreements Act of 1979—*i.e.*, that delay "could make an ultimate resolution of an issue in a party's favor irrelevant because of the irreversible damage suffered during the interim period". S.Rep. No. 249, 96th Cong., 1st Sess. 245 (1979). On the record before us and Bethlehem's own contentions and actions, that is plainly not this case.

### IV

We turn finally to the question of the effect of 28 U.S.C. § 2636(c) on 19 U.S.C. § 1516a, although the CIT did not cite 28 U.S.C. § 2636(c) as supporting its holding that Bethlehem's summons was untimely filed. That subsection provides:

> (c) A civil action contesting a reviewable determination listed in section 516A of the Tariff Act of 1930 [19 U.S.C. § 1516a], other than ... [certain preliminary determinations], is barred unless commenced in accordance with the rules of the Court of International Trade *within thirty days after the date of the publication of such determination in the Federal Register.*

(Emphasis added.)

We have little difficulty reading 28 U.S.C. § 2636(c) together with 19 U.S.C. § 1516a, even though the latter provision says that final affirmative determinations may be challenged within thirty days of publication of the related countervailing duty order, and the former, quoted immediately *supra*, literally says that a challenge should be commenced within thirty days of publication of the determination itself.

---

**11.** Congress did explicitly provide, in defined situations, for appeals at an earlier stage of countervailing duty proceedings. *See, e.g.,* 19 U.S.C. § 1516a(a)(1)(B)(i) ("extraordinarily complicated" cases); 19 U.S.C. § 1516a(a)(1)(B)(ii) (preliminary determination of no subsidy). The premise for allowance of such earlier appeals is that the interested parties could otherwise suffer irreversible damage while the countervailing duty proceeding continued. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 245 (1979), U.S.Code Cong. & Admin.News 1979 p. 381. In the present situation Congress provided no such earlier appeal, apparently because of the unlikelihood of serious injury to the domestic interested parties in the relatively short interim between the ITA's final determination and the countervailing duty order. Suspension of liquidation continued after the ITA's publication of its negative finding on DFE.

**12.** *Republic Steel Corp. v. United States,* 4 CIT 17 (1982), *supra; United States Steel Corp. v. United States,* slip op. 83–59 (CIT June 17, 1983), *vacated,* slip op. 84–12 (CIT Feb. 24, 1984); *United States Steel Corp. v. United States,* slip op. 83–65 (CIT June 28, 1983), *vacated,* slip op. 84–12 (CIT Feb. 24, 1984).

These statutes are clearly *in pari materia*. The Customs Court Act of 1980 (of which 28 U.S.C. § 2636(c) is a part) and the Trade Agreements Act of 1979 (including 19 U.S.C. § 1516a) were companion measures concerning the administration of the countervailing duty and antidumping laws. In fact, the House Judiciary Committee, responsible for the Customs Court Act, worked closely with the House Ways and Means Subcommittee on Trade, which had been responsible for the Trade Agreements Act, in order to ensure that the two sets of legislative provisions did not conflict. *See* 126 Cong.Rec. 26,554 (1980). ("[T]he Judiciary Committee has engaged in a continuing dialog with the Ways and Means Committee's Subcommittee on Trade to assure that ... [the bill (later incorporated into the Customs Court Act of 1980)] is consistent with their work in American foreign trade policy, particularly in the area of imports".)

Congress intended that 28 U.S.C. § 2636(c) should "substantially restate ... the law set forth in section 516A of the Tariff Act of 1930 [19 U.S.C. § 1516a], as added by the Trade Agreements Act of 1979". H.R.Rep. No. 1235, 96th Cong.2d Sess. 56, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3729, 3767. A provision declaring that challenges to final affirmative determinations must be taken prior to the issuance of a countervailing duty order would have constituted a substantial departure from the law set forth in 19 U.S.C. § 1516a(a)(2)(A)(ii) and (B)(i), and there is absolutely no reason to believe that Congress intended such a radical change. Indeed, the evidence points the other way. Congress amended 19 U.S.C. § 1516a only to the extent of shortening the time limits during which certain interlocutory challenges could be brought from thirty to ten days following publication of the determination. As stated in the Senate Report accompanying S. 1654 (the bill that became the Customs Court Act after amending its language to contain the text of the House bill):

Proposed section 2636(c) [which became § 2636(d)] sets forth the time limits for instituting two types of civil actions which were first authorized by the Trade Agreements Act of 1979. While that Act authorized suit within 30 days, that period of time is far too long in light of the fact that the decisions to be reviewed ... are decisions which in effect merely extend the time within which the agency may act. Therefore, section 2636(c) [§ 2636(d)] reduces the time period of 30 days provided for in the Trade Agreements Act of 1979 to 10 days.

Proposed subsection 2636(d) [which was adopted as § 2636(c)] sets forth the time limit for the commencement of suit under section 516A of the Tariff Act of 1930 [19 U.S.C. § 1516a]. *This subsection merely restates the provisions contained in section 516A of the Tariff Act of 1930.*

(Emphasis added.) S.Rep. No. 466, 96th Cong., 2d Sess. 17 (1979).

Against such strong indications that Congress intended merely to restate those aspects of 19 U.S.C. § 1516a which it did not explicitly change, we are unable to interpret 28 U.S.C. § 2636(c) as a repeal of 19 U.S.C. § 1516a(a)(2)(A)(ii) and (B)(i). Of course, repeals by implication are not favored. *FAA Administrator v. Robertson*, 422 U.S. 255, 265, 95 S.Ct. 2140, 2147, 45 L.Ed.2d 164 (1975).

For these reasons, the CIT's decision, holding that Bethlehem's summons was untimely filed and dismissing Bethlehem's complaint, is reversed, and the case is remanded for consideration on the merits.

REVERSED AND REMANDED.